## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BLUE GENTIAN, LLC, et al.,** | |
| **Plaintiffs,** | **Civil Action No. 13-4627 (FSH)** |
| **v.** | |
| **TELEBRANDS CORP., et al.,** | **REPORT & RECOMMENDATION** |
| **Defendants.** | |

PRESENTLY before the Court is a Motion to Dismiss by Defendant, Telebrands Corp. ("Telebrands"). Docket Entry No. 23. Telebrands requests that the Court dismiss the claims asserted by Plaintiff, National Express, Inc. ("NEI"), for lack of standing. Telebrands also requests that the Court strike Plaintiffs' pleadings under Fed. R. Civ. P. 12(f) for improperly referencing patent claim charts in the Complaint. Plaintiffs, Blue Gentian, LLC ("Blue Gentian") and NEI, oppose the motion, arguing that NEI has standing to sue for infringement and that striking the pleading is inappropriate. The Court considers the arguments of the parties without oral argument pursuant to L. Civ. R. 78.1(b). For the reasons set forth below, the Court recommends that Telebrands' Motion to Dismiss be denied.

### I.    Procedural History

The underlying action is one of five cases presently consolidated before this Court relating to patents owned by Blue Gentian. *See* Order at Docket Entry No. 19. Each of the five actions concern two United States patents: U.S. Patent No. 8,291,941 ("the '941 patent") and U.S. Patent No. 8,291,942 ("the '942 patent").[1] *See* Complaint ("Compl.") ¶13, at Docket Entry

---

[1] Of the five cases, three involve Telebrands: the instant case, Civil Action 13-4627, and Civil Actions 13-481 and 12-6671. Two others, Civil Action No. 13-1758 and Civil Action No. 13-7099, are patent infringement actions by Blue Gentian and National Express against Tristar Products.

No. 1.  Two, the instant Civil Action No. 13-4627 and Civil Action No. 13-7099, assert claims for infringement of a related patent, U.S. Patent No. 8,479,776 ("the '776 patent").

On or about July 31, 2013, Blue Gentian and NEI filed this action against Telebrands; Bed Bath & Beyond, Wal-Mart Stores, Inc. ("Wal-Mart"), the Walgreen Company, Rite Aid Corporation (together the "Retail Defendants"); and Ajit "A.J." Khubani, Telebrands' president.[2] In Civil Action Nos. 12-6671 and 13-481, Plaintiffs asserted direct and indirect infringement claims against Telebrands for the '941 and '942 patents.  In the instant case, Plaintiffs assert claims of direct and indirect infringement of the '776 patent by Telebrands (Count I & II); direct and indirect infringement of the '941, '942, and '776 patents by the Retail Defendants (Counts III – VIII); and indirect infringement of the '941, '942, and '776 patents by Khubani (Counts IX - XI).

There are three Motions to Dismiss pending.  The Retail Defendants filed a motion to dismiss or, in the alternative to stay the action against them until the underlying infringement claims are litigated.  *See* Docket Entry No. 21.  The Retail Defendants also requested that the Court strike Plaintiffs' pleadings under Rule 12(f).  *Id.*  Khubani too filed a Motion to Dismiss for failure to state a claim as to him and to strike the Complaint under Rule 12(f).  *See* Docket Entry No 22.  The instant motion is the third in which Telebrands seeks an order dismissing the infringement claims of National Express and striking the Complaint.  *See* Docket Entry No. 23.

---

Civil Action Nos. 12-6671 and 13-481 are mirror patent infringement actions.  In 12-6671, Telebrands filed a declaratory action against Blue Gentian, NEI, and inventor Michael Berardi.  In that case, the Court granted NEI's motion to amend to add patent infringement counterclaims.  *See* Docket Entry Nos. 122 and 123.  Civil Action No. 13-481 was filed by Blue Gentian against Telebrands in the United States District Court for the Southern District of Florida.  That action was transferred to this Court in January 2012.  In that case, this Court also granted Blue Gentian's motion to join NEI as a co-plaintiff on the infringement claims. *See* Docket Entry Nos. 81 and 83. Telebrands opposed both motions on the same standing grounds discussed herein.  On March 12, 2014, Telebrands filed appeals of those decisions before the Hon. Faith S. Hochberg, U.S.D.J.  *See* Docket Entry No.130 at Civil Action No. 12-6671 and Docket Entry No.88 at Civil Action No. 13-481.

[2] Defendants Bed Bath & Beyond, Inc. and Rite Aid Corporation have since been voluntarily dismissed.  *See* Docket Entry Nos. 17 & 50.

In each of the three Telebrands cases, Telebrands makes the same argument to dismiss NEI for lack of standing.  *See* Telebrands' Brief in Support of Motion to Strike and Dismiss ("Telebrands' Br.") at 2-4, Docket Entry No. 23-1.  To bring a patent infringement claim, a party must be the "owner" of the patents, the successor in title, or a member of a narrow category of "exclusive" licensees.  *See* Telebrands' Br. at 2.  Telebrands argues that because of the manner in which Blue Gentian and NEI have divided their respective markets, there is in effect no exclusivity between where and how Blue Gentian may sell its products and where and how NEI sells its products.  *Id.*at 6-7.  In support of the instant motion, Telebrands adds new documentation of an extra-United States assignment which, as Telebrands urges, demonstrates the NEI is not an exclusive licensee.  *See id.* at 7; Telebrands' Reply ("Reply") at 6-7, Docket Entry No. 43.  As a result, Telebrands argues, NEI is not the type of licensee which may bring an infringement claim.  *Id.*

Telebrands' second request is for the Court to strike the pleadings because Plaintiffs improperly included claim construction charts in the Complaint.  Telebrands' Br. at 5. Paragraph 29 of the Complaint states:

> It has become apparent to Plaintiffs that Telebrands has recently redesigned certain features located within the inlet and outlet couplers of the Pocket Hose.  Nevertheless, as demonstrated in the claim charts attached as Exhibits "I" through "L" hereto, the Pocket Hose remains an infringement of the '941, '942, and '776 patents.

*Id.*  Exhibits I though L are claim charts setting forth Plaintiffs' various contentions.  *See id.* Telebrands argues that by incorporating complex claim charts into the Complaint, Plaintiffs go far beyond the standard of pleadings as required by the Federal Rules of Civil Procedure and co-opt the Local Patent Rules.  Telebrands' Br. at 5.  Since the patent rules provide a defined

schedule for the submission of contentions, Telebrands is prejudiced by having to respond to contentions early and without the benefit of the supporting documents as required by the Rules.

Plaintiffs oppose the motion, arguing that NEI is an exclusive licensee with the ability to sue for patent infringement.  *See* Plaintiffs' Opposition ("Pls.' Opp.") at 6-11, at Docket Entry No. 35.  Further, NEI asserts that Telebrands' request to strike the pleading should be denied since it only asks the pleadings to be stricken for being overly inclusive.  *Id.* at 4-6

On November 21, 2013, a scheduling order was entered which consolidated Civil Action No. 13-4627 with the previous cases.  *See* Docket Entry No. 49.  The Court consolidated the final fifth case and set a new scheduling order on February 26, 2014.  *See* Docket Entry No. 59.

## II.    Background[3]

The patents are purported to cover an expandable and contractible hose, marketed by Blue Gentian under the name "Xhose."  Compl. ¶¶13-14.  NEI is a licensee of Blue Gentian.  *See Id.* ¶15.  Pursuant to their licensing agreement ("Agreement") and amendment to the Agreement ("Amendment"), Blue Gentian granted NEI various rights "to make, use, sell, offer for sale, import, market, promote and/or distribute expandable/retractable hoses embodying the inventions disclosed in the '941 and '942 patents, within certain non-geographic markets."  *Id.* Telebrands markets a competing hose product called Pocket Hose, which is alleged to infringe on the '941 and '942 patents.  *Id.* ¶17.  NEI asserts that Telebrands sells its competing hose in the markets which were licensed to NEI.  *Id.* ¶15.

---

[3] As discussed below, the Court finds Telebrands' motion to dismiss is a facial challenge of the Court's jurisdiction. Thus, the Court grants a presumption of truth to the facts alleged in the Complaint for the purposes of this motion. *See Towaki Komatsu v. NYP Holdings, Inc.*, 2013 WL 504602 at *1 (D.N.J. Feb. 7, 2013)

On or about July 12, 2012, Blue Gentian entered into a licensing agreement with NEI under the patents to manufacture, market, and sell the Xhose product.  *See id.* ¶15; Agreement at Docket Entry No. 90-1.[4]  Pursuant to Section 2.1 of the Agreement, Blue Gentian

> grant[ed] to NEI, upon and subject to all the terms and conditions of this Agreement, a royalty-bearing, exclusive license, including the right to sublicense, under the Licensed Patents and the Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market promote, and/or distribute Licensed Products in the DTC [Direct to Consumer] Market and the Retail Market in the Territory."

*Id.*

The Agreement applied worldwide and delineated the parties' respective fields of operation as certain defined markets.  *See id.* ¶¶1.6 & 1.8.  Paragraph 1.8 identified five different markets:

> 1.8 The relevant markets in which Licensed Products will be marketed, promoted, distributed and sold pursuant to this Agreement are as follows:
>
> 1.8.1 The "Direct to Consumer ('DTC') Market" shall refer to sales of Licensed Products offered or made through television, print, mail order and/or internet channels to end users of Licensed Products.
>
> 1.8.2 The "Retail Market" shall refer to large and small retailers. By way of example and not by limitation, such retailers include Wal-Mart, CVS, and Bed Bath & Beyond.
>
> 1.8.3 The "Commercial Market" shall refer to sales of Licensed Products offered or made to businesses, agencies, institutions, commercial contractors or commercial contractor distributors.  The "Commercial Market" does not include retailers or websites selling directly to consumers.  It is understood that Licensed Product sold to the Commercial Market shall be manufactured with materials

---

[4] Both parties reference the briefing and exhibits in the related 12-6671 and 13-481 cases.  Since the parties incorporate their arguments made in the 6671 and 481 cases, the Court will refer to the briefs from the 12-6671 case as "6671 Pls.' Br.," for NEI's brief in support of its Motion to Amend, Docket Entry No. 86; "6671 Telebrands' Opp." to refer to Telebrands' Opposition brief at Docket Entry No. 90; and "6671 Pls.' Reply" for NEI's Reply brief at Docket Entry No. 93.

used for commercial use, as opposed to materials suited only for home use by individual consumers.

1.8.4 The "Premium Market" shall refer to sales of Licensed Products offered or made to businesses agencies, institutions or commercial contractors that intent to use Licensed Products with their respective names, logos or other custom indicia other than a Licensed Trademark thereon, and do not intend to re-sell a Licensed Product to end retail consumers.  The "Premium Market" does not include retailers or websites selling directly to consumers.

1.8.5 The "Live Show Market" shall refer to sales of Licensed Products offered or made at shows, conventions or events including, without limitation, home shows, boat shows, RV shows, or trade shows.

*Id.*

NEI was limited to practicing its rights in the DTC and Retail Markets, and in fact paragraphs 2.2 and 2.3 explicitly forbid NEI to "directly or indirectly manufacture, have manufactured, sell or distribute Licensed Products to or for any person or entity" in the Commercial, Premium, or Live Show Markets without the prior consent of Blue Gentian.  *Id.*

The remainder of the Agreement sets out other rights and restrictions on NEI's ability to practice the patent rights.  For example, Blue Gentian retained the right to review products by NEI's manufacturer and the right to audit NEI's books.  *See* Agreement ¶¶2.1.3 & 4.1.  Blue Gentian also explicitly retained the ownership of all intellectual property, including any modifications designed by NEI.  *See id.* ¶¶5.1 & 5.2.1.

While the ownership of all intellectual property rights remained with Blue Gentian, the Agreement allotted both Blue Gentian and NEI rights to initiate and participate in infringement suits.  *See id.*  ¶¶5.4, 5.4.2 & 5.4.3.  The provisions are nearly identical, with Blue Gentian granting itself the option, but not the obligation, to initiate suits:

5.4.2 BG [Blue Gentian] shall have the right, but not obligation, to bring suit at its own expense to prevent such infringement and to

6

recover profits and damages therefrom.  NEI agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BG's expense.  If BG decides to undertake such suit, then BG shall have the sole right to control prosecution, and the right to settle and compromise such action with NEI's prior written consent, which shall not be unreasonably withheld.

5.4.3 NEI shall also have the right, at its sole discretion, to bring suit at its own expense to prevent infringement of the Licensed Patents and to recover profits, damages, and any and all other available remedies therefrom.  BG agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at NEI's expense.  BG shall cooperate with NEI as is reasonably necessary in any such action brought by NEI. If NEI brings legal action, NEI shall have the sole right to control prosecution, and the right to settle and compromise such action with BG's prior written consent, which shall not be unreasonably withheld.

*Id.*

The Agreement also allowed both parties the ability to transfer their respective rights. Paragraph 2.1 granted NEI the right to sublicense.  Paragraph 12.4 granted the parties mutually limited rights to assign their interests under the patents.  Subject to certain events such as a sale of all assets, merger, or reorganization, "no Party [could] assign any rights or delegate any duties under this Agreement without the other's prior written consent, and any such attempted assignment or delegation without such consent will be void."

On or about March 5, 2013, the parties executed an Amendment to the Agreement that modified the markets in which each party sells.  *See* Amendment at Docket Entry No. 90-1. Specifically, the Amendment grants to NEI the ability to sell in all defined markets in territories outside the United States.  *Id.*  Additionally, the Amendment recognizes that the parties' mutual wish for NEI "to grant certain rights in international territories under [Blue Gentian's]

intellectual property" to a third party distribution company.[5]  *Id.* at ¶1.  The Amendment clarified that Blue Gentian did not cede any rights for the Commercial, Premium, or Live Show Market within the United States.  *Id.* at ¶1.  Any paragraphs that reflected the prior limited markets were likewise rescinded and replaced.[6]  *See id.*

In the instant motion, the parties included two additional documents relating to the licensing rights of NEI and Blue Gentian.  Exhibit C to Telebrands' Motion to Dismiss is a copy of an "Exclusive Patent License Deed between Blue Gentian, LLC, and Brand Developers Aust. Pty. Limited."  *See* Certification of Jeffery L. Snow in Support of Motion by Defendant Telebrands Corp., Docket Entry No. 23-2.  The document contained in Exhibit C is entitled "Request for Registration of an Interest in a Patent" and states:

> We, Blue Gentian, LLC, … requests that Brand Developers Aust Pty Limited …, be entered in the Register of Patents as Exclusive licensees of Patent Nos. 201201797, 2012101799, 2013100379, and 2013100354.
> The Grounds on which this application is made are as follows:
> An exclusive licence was granted, on 31 July 2013 to Brand Developers Aust Pty Limited.

*See* Exhibit C to Telebrands' Motion to Dismiss ("Australian Registration"), Docket Entry No. 23-5 (addresses omitted).  Attached as Exhibit D to Plaintiffs' Brief in Opposition is a copy "of the Acknowledgment executed by National Express in connection with the Exclusive Patent License Deed entered into between Blue Gentian and Brand Developers Aust Pty Ltd."  *See* Declaration of George C. Jones in Support of Plaintiff's Opposition to Telebrands' Motion to

---

[5] Paragraph 2.1, the scope of the license, was rescinded and replaced.  Under the new terms, Blue Gentian granted NEI additional rights under the patents for "a royalty-bearing, exclusive license, including the right to sublicense, under the Licensed Patents and the Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market, promote, and/or distribute Licensed Products in the Premium Market, Live Show Market, and the Commercial Market in the Territory except for the United States."  *Id.* at ¶1.

[6] As the provisions in the Amendment only expand NEI's territory without the United States, the Amendment has little impact on the analysis as stated herein.  As such, the Court refers to the original Agreement.  Any analysis would equally apply to the new provisions in the Amendment.

Strike and Dismiss, Docket Entry No. 35-1.  The Acknowledgement is undated but signed and consists of only two points:

> National Express Inc. hereby acknowledges that:
>
> 1. E. Mishan & Sons, Inc. (Mishan) has entered into an Agreement with Brand Developers Aust Pty Ltd (the Agreement) and under that Agreement, Mishan within Australia and New Zealand for the duration of term of the Agreement;
>
>> (a) appointed Brand Developers as the exclusive authorised distributor of the XHOSE product within Australia and New Zealand; and
>>
>> (b) Blue Gentian LLC and Mishan have agreed to grant Brand Developers the exclusive license to the patent rights in and related to the XHOSE product within Australia and New Zealand for the duration of term of the Agreement.
>
> 2. National Express Inc. consents to the license in Paragraph 1 for the duration of the term of the Agreement.

*See* Exhibit D to Pls.' Opp., Docket Entry No. 35-5.

### III.  Motion to Dismiss NEI's infringement claims under 12(b)(1)

#### A.  *Statement of Law*

##### a.  *Motion to Dismiss under Fed. R. Civ. P. 12(b)(1)*

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the jurisdiction of the federal court to hear the claims.  *Towaki Komatsu v. NYP Holdings, Inc.*, 2013 WL 504602 at *1 (D.N.J. Feb. 7, 2013).  "Standing is a jurisdictional matter and thus 'a motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1).'"  *Id.,* 2013 WL 504602 at *1 (quoting *Ballentine v. U.S.*, 2006 WL 3298270 at *1 (D.V.I. Sept. 21, 2006)).  Under a 12(b)(1) motion, the burden shifts to the party asserting jurisdiction.  *See id.,* 2013 WL 504602 at *1.

Motions to dismiss under 12(b)(1) may be treated as either a facial or factual attack on the jurisdictional basis.  *Id.,* 2013 WL 504602 at *1 (citing *Gould Electronics, Inc. v. U.S.*, 220

F.3d 169, 176 (3d Cir. 2000)).  A facial attack offers the same protections as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Courts consider the allegations as stated in the Complaint and documents referenced therein in the light most favorable to the nonmoving party.  *Id.*  A factual attack challenges the alleged facts, and the court may consider evidence outside the pleadings, including sworn statements.  *Id.*  Under such review, the facts plead are not granted a presumption of truth.  *Id.*

Telebrands argues that under the case law, NEI is not an exclusive licensee.  The Court, therefore, finds that Telebrands' motion is a facial challenge to the NEI's standing.  Thus, the facts alleged in the pleadings are entitled to a presumption of truth for the purposes of this motion.  Additionally, under a 12(b)(6) motion, courts may consider the complaint and documents referenced therein as well as matters of public record and undisputedly authentic documents if the claims are based upon those documents.  *See Pension Benefits Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Id.* at 1196.

Here, Telebrands attached the Agreement and Amendment to its 6671 Opposition to the Motion to Amend in Action 12-6671, as Exhibit 1 at Docket Entry No. 90-1; Telebrands attached the Australian Registration as Exhibit C to its Motion to Dismiss; and Plaintiffs attached the Acknowledgement as Exhibit D to their Opposition.  While Telebrands states in a footnote that NEI and Blue Gentian have produced different versions of the Agreement, *see* 6671 Telebrands' Opp. at 2, n.1, both parties extensively discuss and rely on these exhibits in the underlying claims and the instant motion.  While this motion is a 12(b)(1) challenge, a facial attack operates in

much the same way as a 12(b)(6) motion.  Thus, the Court will consider the agreements attached as Exhibits and described above, as necessary.

### b.  Standing in Patent Infringement Litigation

The Patent Act of 1952 confers on the patentee, and its successors in title, the right to sue for patent infringement.  *See* 35 U.S.C. §§ 281 & 100(d).  In certain circumstances, the right to sue also transfers from the patentee to its assignees or licensees.  *See Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891).  Courts generally recognize three categories of licensee.

The first category consists of those licensees who are assigned "all substantial rights" under the patent.  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991).  The assignment transfers enough of the legal title of the patent to the assignee so that the assignee becomes in effect the patentee.  *Textile Productions, Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998)(citing *Vaupel*, 944 F.2d at 874-75).  Licensees with substantial rights may then sue in their own name, without joining the patent holder.  *Intellectual Property Dev. Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001).

The second category consists of the "exclusive licensee."  An exclusive licensee has fewer than all substantial rights, but still has a proprietary interest in the patent because it was granted the right to exclude.  *WiAV Solutions LLC. v. Motorola*, 631 F.3d 1257, 1266 (Fed. Cir. 2010)("[A] licensee is an exclusive licensee of a patent if it holds any of the exclusionary rights that accompany a patent)."  The "right to exclude is the legal interest created by statute…. Constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) (internal citations omitted); *WiAV Solutions*, 631 F.3d at 1264 ("[A] party has the right to sue for infringement of the patent if that party has a

legally protected interest in the patent related by the Patent Act, so that it can be said to suffer legal injury from the [act] of infringement.")(citing *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007)).

While the exclusive licensee meets the injury in fact threshold of constitutional standing, for considerations of prudential standing, the licensee must join the patentee as co-plaintiff.[7] *See International Gamco, Inc., v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278-79 (Fed. Cir. 2007). The prudential standing requirement addresses the policy concern that an alleged infringer would otherwise be subject to a multiplicity of suits over a single act of infringement. *Id.* at 1279; *see also Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459, 468 (1926) ("The presence of the patent owner as a party…enable[s] the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in one action, or by satisfying one adverse decree to bar all subsequent actions.")

The third category is that of the "bare licensee."  The bare licensee was granted only the ability to practice the patent, without rights to exclude, and thus lacks the constitutional standing to sue for infringement. *See Morrow*, 499 F.3d at 1340-41; *see also WiAV Solutions*, 631 F.3d at 1265; *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995)("If the party has not received an express or implied promise of exclusivity under the patent, *i.e.*, the right to exclude others from making, using, or selling the patented invention, the party has a 'bare license,' and has received only the patentee's promise that that party will not be sued for infringement.").

Since NEI admits it is does not have all substantial rights under the patent and seeks only to join in the infringement claims as co-plaintiff, the question before the Court is whether NEI

---

[7] There is an exception to the rule in which case an exclusive licensee may sue for infringement in its own name, such as where the patent holder is itself the infringer or is otherwise unable to be joined as co-plaintiff. *See Independent Wireless Telegraph Co., v. Radio Corp. of America*, 269 U.S. 459 (1926).

fits within category two, as an exclusive licensee with standing to sue for infringement, or in category three, and is a bare licensee with no standing to sue.

Courts evaluate a licensee's type based on the intent of the parties and the terms of their agreement, looking beyond any labels of exclusivity.  *Textile Productions*, 134 F.3d at 1484; *see also Ortho Pharmaceuticals Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031-32 ("But it is the licensee's beneficial ownership of a right to prevent others from making using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word 'exclusive' may or may not appear in the license.").  For a licensee in the first category, with all substantial rights, courts consider a long list of factors, including the exclusive right to make, use, or sell; the control of the licensor over the licensee's activities; and the licensee's freedom to assign and/or sublicense.  *See Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010).[8]  Of special consideration for the first category is the right of the licensee to sue for infringement as compared to which rights, if any, are retained by the licensor. *Id.*  Where a licensor retains the ability to sue, a licensee cannot have all substantial rights.  *Id.*

Standing for an exclusive licensee, in contrast, is evaluated by the licensee's right to exclude.  "To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Rite-Hite*, 56 F.3d at 1552.

---

[8] As set out in *Alfred E. Mann*, courts consider a variety of factors, including "the exclusive right to make, use, and sell products or services under the patent[,]… the scope of the licensee's right to sublicense the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent." *Id.*, 604 F.3d. at 1360 (citations omitted).

While several older Federal Circuit cases have considered any restriction on the licensee's exclusivity as evidence that the license is not exclusive, the Federal Circuit in *WiAV Solutions LLC v. Motorola, Inc.*, held that total exclusion was not required. *Id.*, 631 F.3d 1257. Facing a patent with a web of licenses and sublicenses, the *WiAV Solutions* Court found that the inquiry for standing purposes was a more narrow inspection of licensee's right to exclude vis-à-vis the alleged infringer. *Id.* at 1266 ("Because an exclusive licensee derives its standing from the exclusionary right it holds, it follows that its standing will ordinarily be coterminous with those rights."). As "a licensee is an exclusive licensee of a patent if it holds any of the exclusionary rights that accompany a patent," a licensee is injured if another encroaches upon those rights. *Id.* Therefore, a court must examine the respective rights and abilities of the infringer to obtain a license and the licensee to exclude others. *Id.* at 1267 ("If the accused neither possesses nor can obtain such a license, the exclusive licensee's exclusionary rights with respect to that accused party are violated by any acts of infringement that such party is alleged to have committed, and the injury predicate to constitutional standing is met.") The primary question is then "whether [the licensee] has shown that it has the right under the patents to exclude the *[d]efendants* from engaging in the alleged infringing activity and therefore is injured by the defendants' conduct." *Id.* (emphasis in original).

B. *Analysis*

a. *Field of Use Licensee*

Telebrands does not contest that the Agreement provides NEI the rights to make, use, sell, offer to sell, or market the products in the markets as defined. Instead, the main thrust of its argument is that the markets by which the parties delineate their rights lack any identifiable boundaries, and thus cannot create exclusivity. 6671 Opp. at 7. Telebrands argues that the

Agreement uses different criteria for each market which, in reality, creates overlap in end users and methods of marketing.  *Id.*  For example, the DTC Market is defined by method of advertising – *e.g.*, television or internet – to a consumer base whereas the Live Show Market is identified by location, regardless of purchaser.  *Id.*  Because of the nebulous nature of the market definitions, "Blue Gentian may license others in markets ostensibly licensed 'exclusively' to National Express."  6671 Opp. at 8.  Such an event would convert NEI's exclusive license into a nonexclusive one.  *Id.*  As an exclusive licensee is defined by the patentee's promise to exclude others, the overlap in end-users and definitions negates NEI's exclusivity.  *Id.*

NEI argues that Telebrands' focus on the identity of the buyer is misplaced.  The markets are defined by the point of sale in a manner that segregates Blue Gentian's markets from NEI's markets.  6671 Reply at 8.  Furthermore, recent case law has relaxed the standard requiring the exclusion of all other licenses.  *Id.*  Instead, under *WiAV Solutions*, the question before the Court is whether NEI has the right to exclude Telebrands.  *Id.*  As Telebrands is alleged to be selling its infringing product via channels specified in the Direct-to-Consumer Market – *i.e.*, television, print, and internet – as well as through retailers such as Wal-Mart and CVS in the Retail Market, NEI asserts that it has standing to sue Telebrands for infringement.  *Id.*

It is well settled that a patentee may divide and assign portions of the rights under the patent.  *See* 35 U.S.C. §261; *Waterman*, 138 U.S. at 255 ("The patentee or his assigns may, by instrument in writing, assign grant, and convey, … (2) an undivided part or share of that exclusive right").  Patentees may also license certain claims or uses of the patented inventions.  *See, e.g., International Gamco*, 504 F.3d at 1280 (finding the licensee could not sue without the patentee where the license covered only "lottery games" under a broader patent for a network game system); *Trendx Enterprises, Inc., v. All-Luminum Products, Inc.*, 856 F.Supp.2d 661, 666

(D.N.J. 2012)(finding the licensee was a field of use licensee where the parties had "divided its right to the patented articles based on the type of product each would manufacture and sell" into two categories of marine and non-marine products); *see also A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1217 (Fed. Cir. 2010). Here, Telebrands argues that the market definitions "are haphazard and do not define any specific field of use, as that term is used in the case law." 6671 Opp. at 7. As a result, Telebrands claims the market definitions are in effect illusory. *Id.* at 6-7.

The Court notes, however, that field of use licenses can be defined by market. In *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938), the Supreme Court upheld market-defined field of use licenses, even where the product being sold was interchangeable between fields.[9] *Id.* at 181. The majority ignored the identical nature of the product entirely and focused on the terms of the license itself. *Id.* at 181; *id.* at 184 (Black, J., dissenting). So long as the patentee did not extend the scope of the patent monopoly, it was within the patentee's rights to grant licenses "extending to all uses or limited to use in a defined field." *Id.* As stated more plainly in later cases, it is the patentee's prerogative to define the terms of how its monopoly is exercised, including the types of licenses it grants. *See Munters Corp. v. Burgess Industries, Inc.,* 450 F.Supp. 1195, 1203 (S.D.N.Y. 1977)("Since the patentee, standing alone, has the manufacturer's normal right to select his purchasers or to confine the sale of his patented article to certain areas, *see United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), as well as the patentee's 'exclusive right to make, use, and vend the invention or

---

[9] At issue was a patent for vacuum tube amplifiers used in radio and talking picture technology. *Id.* at 176. The patentee granted nonexclusive licenses to sell the amplifiers in the private field, which included radio broadcast receptions, radio amateur reception, and radio experimental reception, and granted exclusive licenses to the rights to sell the invention in the commercial market, which included talking picture equipment for theaters. *Id.* at 179. An exclusive licensee then sued a nonexclusive licensee for infringement when the nonexclusive licensee in the private field sold its product in the commercial market. *Id.* As the dissent noted, the amplifiers themselves were identical and completely interchangeable between fields with the only difference being a stamp identifying the designated use. *Id.* at 184 (Black, J., dissenting).

discovery,' *United States v. Univis Lens Co.*, [316 U.S. 241, 250 (1942)], the patentee may condition a license for the manufacture and sale of patented article upon similar restrictions.")

Here, Blue Gentian is the undisputed owner of the patents.  Blue Gentian licensed to NEI the right to make, use, and sell the patented inventions via specified channels defined by Blue Gentian.  The fields of Blue Gentian's license are thus valid.  The fact that a consumer may purchase a seemingly identical hose either through the internet from NEI or from a live show from Blue Gentian is inapposite.  The relevant question is, as a field of use licensee, does NEI have such rights to exclude Telebrands from the markets in which it is licensed?  *See WiAV Solutions*, 631 F.3d at 1266.  For that answer, the Court turns to the Agreement itself.

        b.  *The Right to Exclude*

Blue Gentian granted NEI "a royalty-bearing, exclusive license, including the right to sublicense, under the Licensed Patents and the Licensed Trademarks to make (or have made), use, sell, offer for sale, import, market, promote, and/or distribute Licensed Products in the DTC Market and the Retail Market in the Territory."  Agreement ¶2.1.  Telebrands argues that because the markets are haphazard, Blue Gentian may license to anyone any kind of license, including in NEI's markets.  However, as explained above, Blue Gentian has the right to determine how it licenses its rights.  By the terms of the Agreement, Blue Gentian defined the practice areas by markets.  It then granted exclusive rights to NEI in the DTC and Retail Markets.  Blue Gentian does not otherwise reserve the right either expressly or impliedly to grant licenses in the DTC or Retail markets.[10]  Thus, Blue Gentian does not retain any rights to continue to license in NEI's fields of use.

Additionally, Plaintiffs have pled the right to exclude Telebrands.  Blue Gentian granted to NEI an exclusive license to sell in the DTC and Retail Markets and did not otherwise

---

[10] The Court addresses Telebrands' argument that other rights held by Blue Gentian nullifies any exclusivity *infra*.

expressly retain right to license in those markets.  *See* Compl. ¶15.  Plaintiffs plead in their

Complaint that Telebrands sells its infringing product in retails stores such as CVS and Wal-Mart

and via direct to consumer channels such as the internet and television commercials in a manner

that encroaches upon NEI's exclusive markets as defined by the Agreement.  6671Reply at 9-10;

Compl. ¶15.  Thus, the Court finds NEI has sufficiently pled that it has the right under the

Agreement to exclude Telebrands.

<em>c.  The  Right to Sublicense</em>

Telebrands argues that NEI lacks sufficient proprietary rights, such as control over the

product and the right to sublicense.  6671 Opp. at 7-9.  Courts do consider other rights in

licensing agreements to determine if other provisions undercut a party's true authority.  *See*

*Morrow*, 499 F.3d at 1342 ("We stated that the right to license third parties is an important patent

right because implicit in the right to exclude is the right to waive that right; that is, to license

activities that would otherwise be excluded."); *see also Pfizer Inc. v. Teva Pharm. USA, Inc.*, 803

F.Supp.2d 409, 423 (E.D. Va. 2011)(weighing a list of factors such as scope of rights in a given

territory, licensor's right to grant licenses, rights to sue for infringement, and rights related to the

development of the invention).

To the extent that Blue Gentian retains control over the product and may inspect NEI's

choices and books, such control is not inconsistent with a licensee being exclusive.  *See Delano*

*Farms Co. v. California Table Grape Commission*, 655 F.3d 1337, 1343 (Fed. Cir. 2011)(finding

the patentee a necessary party to litigation where it retained some ability to sue as well as control

over the sublicensing).

Still in some circumstances, the right to assign and/or sublicense can affect a party's right

to exclude. *See Morrow*, 499 F.3d at 1342.  Telebrands argues that the Agreement limits NEI's

18

right to assign and demonstrates that NEI does not "own a property right in the patents-in-suit of which it may freely dispose." *See* 6671 Opp. at 10 (citing *Propat,* 473 F.3d at 1194).[11] Telebrands' focus on NEI's limitations is, however, shortsighted. The Agreement equally limits Blue Gentian and NEI. Paragraph 12.4 sets forth the terms under which both Blue Gentian and NEI may assign their respective interests under the contract: "no Party may assign any rights or delegate any duties under this Agreement without the other's prior written consent, and any such attempted assignment or delegation without such consent will be void." Neither Blue Gentian nor NEI may assign its interest without the written consent of the other. *Id.* Moreover, Paragraph 2.1 grants NEI its rights under the Agreement, "including the right to sublicense," and no other provision of the Agreement explicitly limits this ability. *Id.* Because Blue Gentian is prohibited from freely licensing without the consent of NEI, the limits on assignment and sublicensing do not curtail NEI's rights to exclude others from the DTC and Retail markets.

### d. The Right to Sue

Paragraphs 5.4.2 and 5.4.3 of the Agreement set forth the rights of Blue Gentian and NEI respectively for patent infringement litigation. For the most part, the provisions mirror each other. The prominent difference is that Blue Gentian has "the right, but not the obligation" to sue for infringement, while NEI has "the right, at its sole discretion, to bring suit." Agreement ¶¶5.4.2 & 5.4.3. Importantly, the rights to control and settle the litigation are identical. Both paragraphs grant the party bringing the litigation "the sole right to control prosecution, and the

---

[11] The Court notes that in *Propat*, the licensee was found to be a bare licensee with no standing to sue. The case is distinguishable because there the license did not transfer any right to exclude others, but consisted only of the ability to license under the patent and sue for infringement. *See Propat*, 473 F.3d at 1194. Additionally, the right to sublicense was subject to consent by the patentee who could withhold its agreement arbitrarily. *Id.* In contrast, NEI has not only exclusive rights to make, use, or sell the invention in its specified markets, but also the right to sublicense.

right to settle and compromise such action with NEI's [or Blue Gentian's] prior written consent, which shall not be unreasonably withheld."  Agreement ¶5.4.2.[12]

Telebrands argues that Blue Gentian's ability to control and settle any infringement actions renders NEI's exclusivity illusory.  6671 Opp. at 11-12.  Because Blue Gentian may settle the litigation, it thus has the option of licensing another party in the same markets as it granted to NEI.  *Id.*  However, the Court notes that as with the right to assign, the rights to sue and settle litigation are mutually limited.  Just as Blue Gentian may settle litigation which it initiated, NEI may do the same.  Neither party is unfettered.  Both parties must seek the consent of the other party, although it may not be unreasonably withheld.  As NEI retains some ability to withhold consent, NEI's rights under the Agreement are not rendered illusory.  *See Alfred E. Mann Foundation*, 604 F.3d at 1360 (finding a licensee exclusive where the parties shared responsibility for bringing infringement suits and each retained control of any of its own self-initiated actions).

Because Blue Gentian cannot freely license others in the fields held by NEI, the Court finds that the rights Blue Gentian retained do not detract from NEI's right to exclude others such as Telebrands.

### e.   Policy Considerations

Telebrands argues that the ill-defined markets raise the potential for a multiplicity of suits, subjecting it as an alleged infringer to numerous law suits for the same act of infringement.  6671 Opp. at 12.  The Federal Circuit has provided for this concern in its prudential standing requirement of joining the patentee as co-plaintiff.  *See International Gamco,* 504 F.3d at 1278-79.  NEI is not seeking to sue alone, but to join Blue Gentian as co-plaintiff.  Thus, any concern

---

[12] The corresponding sentence in NEI's paragraph states, "[i]f NEI brings legal action, NEI shall have the sole right to control prosecution, and the right to settle and compromise such action with BG's prior written consent, which shall not be unreasonably withheld." Agreement ¶5.4.3

by Telebrands of being open to multiple suits is addressed. *See, e.g., Trendx,* 856 F.Supp.2d at 672, n.6 (commenting on the possible futility of joining the patentee where the patentee had already litigated claims against the alleged infringer).

f. *The Australia and New Zealand Licenses*

The parties dispute the value of the Australian and New Zealand licenses in determining NEI's standing before this Court. Plaintiffs state that the Australian and New Zealand agreements do not affect NEI's standing in this U.S.-based action. *See* Pls.' Opp. at 11. First, the licenses are for Australian patents to be enforced in Australia and are thus irrelevant to Plaintiffs' rights to U.S. patents in the action here. *Id.* Second, as evidenced in the Acknowledgement, NEI consented to the assignment of rights. *Id.*

Telebrands argues that the agreement with Brand Developers Aus Pty Limited ("Brand Developers") undercuts Plaintiffs' claim that NEI is an exclusive licensee. *See* Reply at 6. Telebrands states the Agreement and Amendment purport to give NEI "world-wide rights and all foreign rights in the patents, including non-U.S. patents, to National Express." *Id.* Yet, the Australian Registration shows Blue Gentian granting rights to the Australian patents to Brand Developers. *Id.* "If Blue Gentian has granted rights to a third party that the Plaintiffs represent belong to National Express under the grant clause in question [that NEI has world-wide rights], that would necessarily provide evidence of what rights were actually conferred, whether or not the third party agreement concerns U.S. or foreign patent rights." *Id.*

Telebrands raises an interesting point regarding the parties' interpretations of the various licensing agreements. However, with documents provided, the Court finds there is insufficient information at this stage of review to overcome the factors that weigh in favor of NEI's exclusivity.

21

Moreover, the patent infringement claims here are limited to the United States.  The Patent Act itself contemplates a domestic circle of influence: "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States…" *See* 35 U.S.C. § 154; *see also Ortho Pharmaceutical*, 52 F.3d at 1033; *Vaupel*, 944 F.2d at 875.  Thus, to a certain extent, the diminishment, if any, of NEI's rights under the patents outside the United States is inconsequential.  The foreign licenses do not change the landscape of NEI's rights within the United States, the concern of U.S. patent law.  Under the terms of the contract, NEI's rights remain the same within the United States, and the basis for its standing, NEI's right to exclude Telebrands from the domestic DTC and Retail markets, remains unchanged.  Therefore, NEI's standing remains.

## IV.       Motion to Strike the Pleadings under Fed. R. Civ. P. 12(f)

### A.       *Statement of Law under R. 12(f)*

Pursuant to Fed. R. Civ. P. 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.*  "As a general matter, motions to strike under Rule 12(f) are highly disfavored." *See FTC, v. Hope Now Modifications, LLC*, 2011 WL 883202 at *1 (D.N.J. Mar. 10, 2011).  "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from the plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F.Supp.2d 596, 609 (D.N.J. 2002)(internal quotations omitted).

Inclusion of extra material is not grounds for striking a pleading in its entirety.  *See* 5C Fed. Prac. & Proc. Civ § 1383 (3d ed.).  While a verbose pleading may be in violation of the

principle of simplicity established by Rule 8, courts will deny a motion to strike where the additional information is inconsequential, not prejudicial, and/or perhaps helpful. *Id.; see also, Randolph Laboratories v. Specialties Development Corp.,* 62 F.Supp. 897, 900 (D.N.J. 1945). However, courts do strike extraneous evidentiary material when it is prejudicial or inadmissible. *See* 5C Fed. Prac. & Proc. Civ. § 1383 (3d ed.); *see also Murphy v. A. S. Kirkeby, Inc.,* 9 F.R.D. 725, 725 (S.D.N.Y. 1949).

        *B.*     *Analysis*

Paragraph 29 of Plaintiffs' Complaint incorporates by reference four claim charts attached as Exhibits I, J, K, and L. *See id.* Plaintiffs take the position that because Telebrands filed a related action and applied for a temporary restraining order on the grounds of non-infringement, Telebrands is more than capable of responding to the claim elements in the pleadings. *See* Pls.' Opp. at 5-6.

Telebrands, however, argues the Complaint should be stricken because the inclusion of the charts violates Fed. R. Civ. P. 8(d)(1) requiring a "simple, concise, and direct" statement. *See* Telebrands' Br. at 4. Moreover, the inclusion of the charts is severely prejudicial because Telebrands would be forced to respond to the claim elements without the documentation and time allowed by the Local Patent Rules. *See id.* at 5. By inserting claim charts in the Complaint, Plaintiffs have disrupted the patent rules schedule, leapfrogging their own responsibilities and accelerating Telebrands' obligations to the very first stages of litigation. *See id.* Telebrands argues that it is put between a rock and a hard place: either respond to the claim contentions without the benefit of the patent rules or deny the allegations and potentially be bound by that denial without "further opportunity under the Local Patent Rules to modify or supplement their infringement claims." Reply at 4.

The Court denies Telebrands' request to strike the claim charts incorporated into Plaintiffs' Complaint.  Rule 12(f) is designed to simplify the matters before the court and remove allegations and material that is inapposite to its decision.  This is a patent infringement case and claim contentions are relevant to the action's eventual outcome.

That being said, the Court recognizes the potential prejudice that Telebrands faces if forced to respond on a point-by-point bases at the pleading stage to each of the contentions or be bound by a general, early denial.  Under the Local Patent Rules, the parties engage in a highly choreographed exchange of information.  Certain information is to be traded, with specified supporting documentation, often followed by another allotted period of time for responses and rebuttals.  *See, e.g.,* L. Pat. R. 3.  The Court is wary of encouraging patent holders to incorporate detailed contentions in its pleadings.  To do so would in effect nullify the Local Patent Rules and put alleged infringers at a severe disadvantage.

The Court thus recommends a balance between the two.  The material is pertinent to the case and should not be stricken.  However, the Court recommends that Telebrands should not be required at the pleading stage to respond to each point of the claim charts, but may fashion a response which adequately and appropriately responds to the allegation in Paragraph 29 of the Complaint.  Telebrands would then respond to Plaintiffs' contentions in due course, in accordance with the Local Patent Rules and the Scheduling Orders set by this Court.

### V.     Conclusion

For the reasons stated above, the Court recommends that Telebrands' Motion to Dismiss NEI's claim for patent infringement be denied.  The Court further recommends that Telebrands' Motion to Strike the pleadings be denied and that Telebrands respond to the claim contentions in due course, in accordance with the Local Patent Rules and Scheduling Orders of this Court.

For good cause shown,

**IT IS** on this **2nd** day of **April, 2014,**

**RECOMMENDED** that Telebrands' Motion to Strike and to Dismiss Claims Asserted by National Express, Inc. [Docket Entry No. 23] be **DENIED**; and it is further

**RECOMMENDED** that Telebrands be granted leave to respond generally to Paragraph 29 of the Complaint without prejudice to responding to the claim contentions in due course; and it is further

**ORDERED** that the Clerk of the Court terminate the aforementioned motion at Docket Entry No. 23 accordingly; and it is further

**ORDERED** that the parties may file an objection to this Report & Recommendation within 14 days of the date of this Order pursuant to Fed. R. Civ. P. 72(b)(2) and L. Civ. R. 72.1(c)(2).

s/James B. Clark, III
**HONORABLE JAMES B. CLARK, III**
**UNITED STATES MAGISTRATE JUDGE**